ACLI INTERNATIONAL COMMODITY SERVICES, INC. and A.C. Israel Enterprises, Inc., Plaintiffs,

v.

BANQUE POPULAIRE SUISSE, Advicorp Advisory and Financial Corporation, S.A., and Naji Robert Nahas, Defendants.

No. 82 Civ. 1058 (MEL).

United States District Court, S.D. New York.

Jan. 30, 1987.

See also 110 F.R.D. 278.

Rogers & Wells, New York City, for plaintiffs; (William R. Glendon, Guy C. Quinlan, of counsel).

Arnold & Porter, Washington, D.C. and Gilbert, Segall & Young, New York City, for defendant Banque Populaire Suisse.

Breed, Abbott & Morgan, New York City, for defendant Naji Robert Nahas; (James D. Zirin, of counsel).

LASKER, District Judge.

Defendant Banque Populaire Suisse ("BPS") moves to dismiss this action on grounds of *forum non conveniens.* The motion is granted subject to the conditions set forth in this memorandum.[1]

### I.

In an earlier opinion in this case, Judge Sofaer, before whom the matter was then pending, set forth the circumstances of the action in some detail. *See ACLI International Commodity Services, Inc. v. Banque Populaire Suisse*, 609 F.Supp. 434, 435–38 (S.D.N.Y.1984). Since familiarity with that opinion is presumed, the facts are described more briefly here.[2]

ACLI International Commodity Services, Inc. ("ACLI")[3] brought this fraud action against BPS, Advicorp Advisory and Financial Corporation, S.A. ("Advicorp"),[4] and Naji Robert Nahas alleging $21,100,000 in damages. ACLI, a Delaware corporation with its principal place of business in New York, was at the time of the events which relate to this action a commodities broker—registered with the Commodity Futures Trading Commission—which as part of its business placed orders for its customers

---

1. BPS moved once before for dismissal of this action on, *inter alia, forum non conveniens* grounds. *See* Notice of Motion (filed July 6, 1982). Judge Sofaer, to whom the case was originally assigned, denied the motion without prejudice to renewal following discovery and prior to trial. *See* Hearing Transcript at 20 (Oct. 21, 1982). Since that time, an amended complaint has been filed and the parties have engaged in substantial discovery, which has itself given rise to complex collateral litigation, *see, e.g., ACLI International Commodity Services, Inc. v. Banque Populaire Suisse*, 110 F.R.D. 278 (S.D.N.Y.1986).

2. All facts recited herein are drawn from ACLI's Amended Complaint, filed on November 12, 1982.

3. Co-plaintiff A.C. Israel Enterprises, Inc. was not involved in the events giving rise to this lawsuit but was added as a plaintiff by virtue of its one-half interest in the proceeds of any recovery in this action. ACLI International Commodity Services, Inc. has since been acquired by Donaldson, Lufkin & Jenrette Futures. In this opinion, "ACLI" is used to refer to either ACLI International Commodity Services, Inc. alone or to plaintiffs collectively, depending on the context.

4. A judgment of default has been entered against Advicorp, after its failure to appear and answer.

who wished to trade on various United States commodity exchanges, including the Commodity Exchange, Inc. ("Comex"), a silver futures market located in New York. BPS is a Swiss banking corporation which at various times maintained a commodities trading account with ACLI. Advicorp is a Swiss corporation which provided investment advice to BPS and its customers and which is alleged by ACLI to have acted as BPS' agent in the transactions which lie at the center of this lawsuit. Nahas, a Lebanese-born citizen of Brazil who currently resides in Sao Paulo, was a trader in silver and silver futures during the volatile period in the silver market in 1979–80.

The gravamen of ACLI's complaint is that BPS, Advicorp, and Nahas engaged in a conspiracy to defraud it by "(i) falsely representing to [ACLI] that several accounts introduced to it by defendants were individual accounts when in fact such accounts were jointly owned and/or controlled by defendants; and (ii) fraudulently directing orders to those accounts for the purpose of evading applicable position limits established by [ACLI and Comex]." Amended Complaint at ¶¶ 14, 18. ACLI alleges specifically that between February 1979 and January 1980 BPS and Advicorp, acting through Pierre-Alain Hirschi (President and Director of Advicorp) and Jean-Jacques Bally (Secretary and Director of Advicorp), introduced nine accounts[5] to ACLI through its Geneva affiliate, ACLI International Commodity Services, S.A. ("ACLI Geneva"), falsely representing to ACLI through ACLI Geneva and its employees, Bernard Baehler and Jean Francois Tredicini de St. Severin, that "the above accounts were wealthy and responsible customers of BPS; that the accounts were each independent investors, trading for their own accounts only; and that no one had any undisclosed interest in any of such accounts." *Id.* at ¶ 22. The complaint also alleges that Hirschi and Bally "submitted account agreements to [ACLI], purportedly signed by the individual ac-

count owners, which falsely represented that 'except as disclosed in writing' to [ACLI] 'no one has any interest in any account or accounts carried by' the individual customer," *id.* at ¶ 23, and that Hirschi and Bally on various occasions after the opening of these accounts gave false assurances to ACLI regarding the identity of those controlling the accounts. In reality, ACLI alleges, the individuals and firm named as account holders were mere nominees of BPS, Advicorp, and Nahas—the accounts being owned and/or controlled by them.

ACLI claims that, relying on the misrepresentations made by defendants through their agents, it accepted orders which in the aggregate exceeded ACLI's and Comex' position limits by several hundred contracts. ACLI alleges that as a result of the fraud, and after the price of silver declined precipitously between January and March 1980 from almost $50 to less than $11 per ounce, defaults of over $28 million occurred in the nominee accounts, and ACLI was required to pay Comex that amount on behalf of those accounts.

In addition, ACLI maintains, as to Nahas, that subsequent to the events described above he fraudulently induced ACLI to agree to accept $8 million in settlement of its fraud claim against him by falsely representing that he did not have sufficient funds to make any larger payment. Neither BPS nor Advicorp participated in these settlement negotiations. ACLI seeks to recover in this action the $20 million difference between the amount ACLI paid to Comex as the result of the alleged fraud and the sum recovered in the settlement with Nahas, as well as the costs incurred in negotiating that settlement.

## II.

■ The standards for deciding a motion to dismiss on *forum non conveniens* grounds were elaborated by the Supreme

---

**5.** The accounts were in the names of Rene Maret, Jean-Jacques Bally, Paul Bisoffi, Pierre-Alain Hirschi, Antoine Achkar, Selim Gabriel Nassif, Imovest Inter S.A. (a corporation), Emir Fayez Chehab, and Francisco Javier Benedi-Garcia. Amended Complaint at ¶ 20.

Court in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). As a threshold matter, application of the *forum non conveniens* doctrine presupposes the availability of an alternative forum where the defendant may be sued. *Id.* at 506–07, 67 S.Ct. at 842. Only in rare circumstances, where the remedy offered by the other forum is clearly unsatisfactory—as where the alternative forum does not permit litigation of the subject matter in dispute, will the other forum be deemed inadequate. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n. 22, 102 S.Ct. 252, 265 n. 22, 70 L.Ed.2d 419 (1981).

■ Once it is established that an alternative forum exists, a court must weigh both the private interests of the litigants and the public interests of the plaintiff's chosen forum to decide whether the facts "(1) establish such oppressiveness and vexation to a defendant as to be out of all proportion to plaintiff's convenience, which may be shown to be slight or nonexistent, or (2) make trial in the chosen forum inappropriate because of considerations affecting the court's own administrative and legal problems." *Koster v. Lumbermens Mutual Casualty Co.*, 330 U.S. 518, 524, 67 S.Ct. 828, 831, 91 L.Ed. 1067 (1947) (companion case to *Gilbert*). The private interest factors include "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; ... and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gilbert*, 330 U.S. at 508, 67 S.Ct. at 843. The public interest factors include the state of the calendar in the plaintiff's chosen forum; the burden of jury duty that "ought not to be imposed upon the people of a community which has no relation to the litigation"; the "local interest in having localized controversies decided at home"; and the "appropriateness ... in having the trial of a diversity case in a forum that is at home with the ... law that must govern the case, rather than having a court in some other forum untangle problems in

conflict of laws, and in law foreign to itself." *Id.* at 508–09, 67 S.Ct. at 843.

*Gilbert* also recognized a rebuttable presumption in favor of the plaintiff's choice of forum, *Gilbert*, 330 U.S. at 508, 67 S.Ct. at 843, a choice which is entitled to special deference when the plaintiff has chosen his home forum. *Koster*, 330 U.S. at 524, 67 S.Ct. at 832 ("[A] real showing of convenience by a plaintiff who has sued in his home forum will normally outweigh the inconvenience the defendant may have shown."). In its most recent extended discussion of *forum non conveniens*, the Supreme Court has refined the doctrinal presumption:

> A citizen's forum choice should not be given dispositive weight, however. Citizens or residents deserve somewhat more deference than foreign plaintiffs, but dismissal should not be automatically barred when a plaintiff has filed suit in his home forum. As always, if the balance of conveniences suggests that trial in the chosen forum would be unnecessarily burdensome for the defendant or the court, dismissal is proper.

*Piper*, 454 U.S. at 256 n. 23, 102 S.Ct. at 266 n. 23 (plurality opinion); *cf. Alcoa Steamship Co. v. M/V Nordic Regent*, 654 F.2d 147, 150–53, 159 (2d Cir.1978) (en banc) (American citizenship of plaintiff does not justify creating a special rule of *forum non conveniens*), *cert. denied*, 449 U.S. 890, 101 S.Ct. 248, 66 L.Ed.2d 116 (1980). "[T]he ultimate inquiry is where trial will best serve the convenience of the parties and the ends of justice." *Koster*, 330 U.S. at 527, 67 S.Ct. at 833.

### III.

#### A.

BPS contends that Switzerland is an adequate alternative forum which has been recognized as such by the Court of Appeals for this circuit. *See Schertenleib v. Traum*, 589 F.2d 1156 (2d Cir.1978) (Feinberg, J.); *see also Fustok v. Banque Populaire Suisse*, 546 F.Supp. 506, 515 & n. 32 (S.D.N.Y.1982) (Weinfeld, J.). Moreover, although BPS recognizes that the Swiss

system does not authorize the full range of pretrial discovery available in the United States district courts, BPS has stated its willingness to "stipulate that all evidence heretofore obtained in discovery in this case may be used in Switzerland." Memorandum of Defendant BPS at 27.

The lynchpin of BPS' argument is that the four key witnesses in this case—Hirschi and Bally (the Advicorp officials who allegedly made the misrepresentations to ACLI) and Baehler and St. Severin (the ACLI officials who allegedly received and relied upon the misrepresentations)—are not now controlled by any party to this dispute and live beyond the subpoena power of this court. Consequently, BPS argues, should this case be tried in New York, none of the crucial witnesses to the events underlying this fraud action will be available to give live testimony before the factfinder. In contrast, according to BPS, since the four witnesses live in Switzerland, they could be compelled by a Swiss court to testify in person at a trial there.

BPS contends that other private and public interest factors support a *forum non conveniens* dismissal as well. First, BPS argues, the focal point of the litigation is Switzerland because defendants BPS and Advicorp are Swiss, plaintiff's Swiss affiliate was the principal actor in the events in question, and several of the allegedly nominal account holders are Swiss. (In this connection, BPS also argues that were the case tried in Switzerland the Geneva customers could be impleaded as primarily responsible third-party defendants, thus allowing a Swiss court to assume more complete jurisdiction over the persons involved and to render more complete relief.) Second, BPS asserts that in addition to the four key witnesses in the case, other witnesses, including current and former BPS employees as well as several of the account customers who reside in Switzerland or other parts of Europe, would find it far more convenient to appear at a trial in Switzerland than in the United States. BPS also points out that the expense and inconvenience of transporting witnesses to the United States would be augmented by the need to translate into English these witnesses' testimony which could be expected to be in their native tongues.

Third, BPS contends that Swiss law will govern many, if not all, of the issues in this case. These include the central allegation of misrepresentations made in Switzerland by Swiss persons to other Swiss persons, who relied in the first instance on the misrepresentations before transmitting them to New York; the allegation of an agency relationship between BPS and Advicorp; and the problems concerning document disclosure under the Swiss secrecy laws. (BPS also argues in this regard that any account holders joined as parties to an action in Switzerland would not be able to assert Swiss secrecy law as a ground for refusing to produce their own documents.) Fourth, BPS asserts that a Swiss court's power to enforce any judgment in ACLI's favor against the Swiss assets of responsible defendants would obviate the need for separate enforcement actions in Switzerland, which could arise if an American judgment could not be satisfied from foreign defendants' assets in this country.

### B.

■ In opposing the motion, ACLI emphasizes that the presumption in favor of the plaintiff's choice of forum is strongest when, as here, the plaintiff is an American citizen residing in the district where suit is brought. ACLI also contends that Switzerland would not be an adequate alternative forum because: (1) the Swiss judicial system is burdened by long delays;[6] (2)

---

6. ACLI's characterization of the Swiss legal system as burdened by inordinate delays is contested by BPS, and the views of the parties' experts are in equipoise. *Compare* Declaration of Jean-Jacques Magnin at ¶¶ 15–16 (Sept. 12, 1986) *with* Verified Statement of Francois Perret (Sept. 30, 1986); Supplemental Verified State-

ment of Gilles Favre, Esq. at ¶ 5 (Sept. 24, 1986). Suffice it to say that only delays significantly greater than those experienced in this district and endemic to a foreign court system could be said to deprive a plaintiff of due process and thereby render a forum inadequate.

Swiss law does not encompass commodities regulatory provisions or concepts of conspiracy to defraud; (3) the need to apply American law to this case would, in Switzerland, require translation of all legal materials into French or German, and proof of American law would be required on each point in dispute; (4) pretrial discovery is unobtainable in the Swiss system; (5) witnesses in Swiss courts are questioned by the presiding judge, not the parties' advocates; (6) jury trial would not be available; and (7) the calling of expert witnesses at a Swiss trial is left to the discretion of the judge.

ACLI also argues that the balance of private and public interests weighs in favor of a trial in New York. First, ACLI contends that a far greater number of witnesses who will offer relevant testimony reside in New York or its environs. These witnesses include seven former ACLI executives (six in New York, one in Washington, D.C.), who will testify to the amount of damages, the nature of position limits, the receipt of and reliance on the misrepresentations, inquiries made into the separateness of the accounts, and the settlement negotiations with Nahas; a Comex official and an expert, who will testify about commodities trading; an expert from Connecticut, who will testify about Nahas' financial condition; and two pairs of New York attorneys who represented ACLI and Nahas respectively in settlement negotiations. In this connection, ACLI asserts that the bulk of documentary evidence—including financial records and customer account documents—is also located in New York and that the burden of translating documentary and testimonial evidence would be greater if the trial were held in Switzerland rather than in the United States.

ACLI also disputes the value or necessity of the testimony of those whom BPS contends are the four key witnesses. As to Hirschi and Bally, ACLI argues that their testimony is unimportant because the misrepresentations are contained in unambiguous documentary evidence: the account agreements transmitted to ACLI in New York. As to Baehler and St. Severin, ACLI maintains that even were they to admit knowledge of the true ownership of the accounts at the time the misrepresentations were made, this knowledge could not be imputed to the ACLI officials in New York who relied on the misrepresentations.

In addition, ACLI contends that moving the trial to Geneva will not ensure the presence of St. Severin, because he resides in the canton of Vaud and cannot, ACLI claims, be called to testify by a Geneva court. Moreover, according to ACLI, a trial in Switzerland on the fraudulent inducement claim would be hampered by the absence at trial not only of Nahas, who heretofore has refused to appear in an American forum, but also of the two New York attorneys who represented him during the settlement negotiations (Irwin Robinson and Joseph Getraer) and are outside the power of the Swiss court. Finally, ACLI asserts that for the few witnesses either side would wish to call at trial who will remain outside this court's subpoena power and the control of the parties, the use of letters rogatory is a satisfactory device which has been approved in numerous cases in this circuit.

A second factor militating against dismissal, according to ACLI, is that the locus of this dispute is in this district—where the opening of all commodities trading accounts and the placing of subsequent orders had to be approved by ACLI's New York office, where the misrepresentations

A brief recitation of the qualifications of the parties' foreign law experts is appropriate. Jean-Jacques Magnin is an attorney and member of the firm of Magnin and Dunand in Geneva, Switzerland, who also holds a doctorate in law from the University of Geneva and was previously associated with the Geneva correspondent of Baker & McKenzie. Francois Perret is a Professor of law at the University of Geneva, who in addition to a doctorate in law holds a masters degree from New York University's Institute of Comparative Law. Prior to teaching, Mr. Perret practiced law both in Geneva and in New York. Gilles Favre is an attorney at the Geneva firm of Comina, Favre & Payot who is a member of the bar in the cantons of Geneva, Vaud, and Neuchatel. He worked for a year in the United States.

consisting of account-opening statements were received by and relied upon by ACLI, and where ACLI suffered 'its losses when the accounts defaulted. (In this connection, ACLI disputes BPS' contention that account holders could be impleaded as third-party defendants, reasoning that the account-opening agreements did not become contracts until accepted by ACLI in New York.).[7] ACLI also contends that both New York—as the site of an important commodities market of great economic importance to the state—and the United States—as a regulator of commodities trading in this country—have a strong interest in deterring the wrongful conduct alleged in this case, ensuring the integrity of the commodities markets, and protecting resident businesses.

Third, ACLI contends that New York law applies to the issues in this case because New York has the most significant contacts with the litigation and because BPS' own account agreement with ACLI provided that the contract would be governed by New York law. Consequently, ACLI argues, this court would not be confronted by the need to apply foreign law if trial were held in New York.

### C.

Nahas, the other defendant who has appeared in this action, apparently joins BPS' motion to dismiss and adopts the arguments put forward by his co-defendant. *See* Letter of James D. Zirin, Esq. (Oct. 7, 1986). In addition, Nahas has committed himself to appear before a Swiss tribunal for the trial of this action should BPS' motion be granted. *Id.*

### IV.

■ Analysis of the numerous points raised by BPS and ACLI leads to the conclusion that the motion should be granted. It is true that the plaintiff's choice of fo-

rum is presumptively favored; however, as the cases have held, such a choice should not bar *forum non conveniens* dismissal in the face of other compelling considerations. The compelling consideration in this case is the inability of court or parties to guarantee the live testimony at trial in New York of those witnesses with uniquely first-hand knowledge of the fraud with which defendant BPS is charged, as compared to the power of a Swiss tribunal to compel such testimony from at least three—and more likely all four—of the witnesses. No other private or public interest present in this case approaches this consideration in importance.

### A.

A threshold finding upon which a *forum non conveniens* dismissal is conditioned is that there be an adequate alternative forum where the case can be brought. Switzerland satisfies this requirement. In a fraud case involving silver futures contracts not unlike this action, Judge Weinfeld found that Switzerland provided an adequate alternative, stating: "Procedures in foreign courts need not be identical to U.S. procedures as long as the alternative forum is not 'wholly devoid of due process.'" *Fustok v. Banque Populaire Suisse*, 546 F.Supp. 506, 515 & n. 32 (S.D. N.Y.1982) (quoting *Alcoa Steamship Co. v. M/V Nordic Regent*, 654 F.2d 147, 159 n. 16 (2d Cir.1978), *cert. denied*, 449 U.S. 890, 101 S.Ct. 248, 66 L.Ed.2d 116 (1980)). In taking this position, Judge Weinfeld acknowledged what the Second Circuit Court of Appeals had recognized years earlier. *See Schertenlieb v. Traum*, 589 F.2d 1156 (2d Cir.1978).

■ ACLI's specific objections to the adequacy of the Swiss forum do not alter this conclusion. The more active role of the judge in civil law systems—for exam-

---

7. ACLI's reasoning is not clear. Although under American law the place in which such contracts were formed might bear upon the determination of what law applies, it would not affect the question whether there was liability in contract—presumably the basis for impleader. Per-

haps ACLI's argument is premised on Swiss law. *Compare* Verified Statement of Gilles Favre, Esq. at ¶ 7 (July 31, 1986) *with* Plaintiff's Memorandum in Opposition at 22–23. In any event, the decision on the instant motion to dismiss does not turn on a resolution of this issue.

ple: the discretion to call expert witnesses, the responsibility for initial questioning of all witnesses, the absence of jury trials—does not deprive litigants of due process, though it does shift some control over the proceedings from attorneys to the judge. As for ACLI's potentially more serious criticism that a Swiss court would not entertain its common law fraud cause of action, not only is it hard to believe that a highly developed legal system is not equipped to try charges of such a basic civil wrong, but the contention is belied by the current litigation in Switzerland of the common law "conspiracy to cheat and defraud" claim that formed part of the action in *Fustok. See Fustok*, 546 F.Supp. at 513 & n. 23; Supplemental Verified Statement of Gilles Favre, Esq. at ¶ 3.

ACLI's argument that the need to apply American law to this dispute makes a Swiss forum inadequate due to its lack of familiarity with American law and the heavy burden of translation of legal materials required ignores the Supreme Court's demonstrated willingness to dismiss a case on *forum non conveniens* grounds even where the alternative forum will be faced with questions of American law. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 260, 102 S.Ct. 252, 268, 70 L.Ed.2d 419 (1981) (plurality opinion). Moreover, it is not clear that American law will figure more prominently in this case than Swiss law, and thus the choice of law may in fact favor litigation in a Swiss forum.

Finally, as to the absence of pretrial discovery in the Swiss system, BPS has stated that it will consent to the use in a Swiss adjudication of the considerable discovery taken to date in this 1982 case in the United States, subject to limitations imposed by customer waivers. The dismissal is conditioned on such consent and BPS' best efforts to effectuate the use of such discovery. Moreover, experience in the ongoing Swiss litigation of the *Fustok* case suggests that Swiss courts will admit into evidence documents obtained by United States discovery procedures. *See* Supplemental Verified Statement of Gilles Favre, Esq. at ¶ 6.

## B.

The primary consideration supporting dismissal of this action on grounds of *forum non conveniens* is, as noted above, the incapacity of this court to compel the live testimony in New York of the four key witnesses to the alleged acts of fraud. As the Supreme Court stated in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947): "Certainly to fix the place of trial at a point where litigants cannot compel personal attendance [of witnesses] and may be forced to try their cases on deposition, is to create a condition not satisfactory to court, jury or most litigants." *Id.* at 511, 67 S.Ct. at 844; *see also, e.g., Schertenleib v. Traum*, 589 F.2d 1156, 1165 (2d Cir.1978) ("Perhaps the most significant problem is presented by the inability to bring plaintiff and his alleged coconspirator here for live cross-examination before a factfinder.... Since the crux of this litigation is the truth or falsity of [defendant's] charges that plaintiff is a swindler, to be able to take the alleged coconspirator's testimony by letter rogatory only would be a very serious handicap."); *Fustok*, 546 F.Supp. at 511 ("When fraud charges are made, it is desirable that the factfinder have the benefit of demeanor testimony of witnesses who would be available in Geneva and not the United States."). Since an opportunity for the factfinder to appraise the credibility of key witnesses " 'may well mean the difference between acceptance and rejection of crucial testimony' " in this case, *Fogel v. Wolfgang*, 48 F.R.D. 286, 291 (S.D.N.Y.1969) (quoting *Oil & Gas Ventures-First 1958 Fund Limited v. Kung*, 250 F.Supp. 744, 756 (S.D.N.Y. 1966)) (28 U.S.C. § 1404(a) transfer), it is apparent that this consideration implicates both the paramount private interest of the defendant in vindication and the primary public interest of the court in seeing that justice is done.

The question, then, is whether the testimony of Hirschi, Bally, Baehler, and St. Severin is crucial to the case, and, if so,

whether that testimony is substantially more likely to be heard at a trial in Geneva than at a trial in New York.

. Despite ACLI's arguments that the misrepresentations at issue are entombed in lifeless account-opening documents and that the knowledge of ACLI Geneva's employees cannot be attributed to ACLI in New York, it is probable that the testimony of the four Swiss witnesses ACLI alleges to have been directly involved in the principal events will shed considerable light on essential elements of ACLI's case against BPS and may even be decisive. Indeed, their testimony may be expected to bear on virtually every disputed issue of fact relevant to the basic fraud claim. For example, the complaint itself alleges that the misrepresentations went beyond the written account-opening statements and strongly implies that Hirschi and Bally gave oral assurances to Baehler and St. Severin regarding the ownership/control of the nine accounts. Amended Complaint at ¶¶ 22, 24. In addition, as BPS points out, the words and conduct of Hirschi and Bally appear to provide an important link between BPS and those account agreements signed by the nominees themselves. Consequently, on the issue of "whether, who, and how" misrepresentations were made by the Advicorp officials to ACLI Geneva officials, the testimony of all four witnesses seems highly pertinent if not indispensable.

The testimony of the four would also appear to be critical on the issue of whether Hirschi and Bally were or purported to be acting on behalf of BPS when they introduced the nine accounts to ACLI Geneva and made related representations about the ownership/control of the accounts to Baehler and St. Severin. Likewise, Baehler's and St. Severin's testimony will be needed to establish whether they believed (or possessed knowledge inconsistent with) the written and oral representations of Hirschi, Bally, or the nominees. If ACLI Geneva could not or did not reasonably rely on the alleged misrepresentations, there would at least seem to be a question as to whether the New York affiliate, ACLI, can be said to have relied.

It remains to inquire about the relative availability of the four key witnesses in the two forums. All four witnesses are Swiss residents who are beyond the compulsory process of this court. Moreover, there is good reason to believe that, as non-parties to this litigation, they would be unwilling to testify here. In this connection, it is highly relevant that although this court instructed the parties "to use their best efforts to arrange the depositions of Baehler and St. Severin ... by July 1, 1986," *ACLI International Commodity Services, Inc. v. Banque Populaire Suisse,* No. 82–1058, slip op. at 3 (May 29, 1986), both individuals apparently refused to be deposed. And although Hirschi and Bally have been named in other so-called "silver" cases, neither has appeared to defend or testify in any action in the United States. Indeed, Hirschi and Bally have indicated through counsel that they would not voluntarily testify in this action in New York. Supplemental Verified Statement of Gilles Favre, Esq. at ¶ 8.

In contrast, a Geneva court could compel the testimony of Hirschi, Bally, and Baehler—all of whom reside in the canton of Geneva. Verified Statement of Gilles Favre, Esq. at ¶ 7; Declaration of Jean-Jacques Magnin at ¶ 12 (Sept. 12, 1986). Although the parties' foreign law experts disagree on the practicability of the procedures for ensuring the live testimony of a witness like St. Severin, who is domiciled outside the canton of Geneva in Vaud, there is no dispute that such a mechanism exists under an inter-canton treaty. *See* Supplemental Verified Statement of Gilles Favre, Esq. at ¶ 7; Declaration of Jean-Jacques Magnin at ¶¶ 2–3 (Oct. 20, 1986). Moreover, as BPS points out, *it* will be the party that shoulders any burdens imposed by the treaty because it is BPS that is most "interested" in St. Severin's testimony.

### C.

The remaining private and public interest factors with a bearing on this case fall into three categories: the necessity, conve-

nience, and likelihood of attendance at trial of other witnesses; the need to apply foreign law; and the local interest in adjudicating the controversy.[8]

### (1)

ACLI has identified a number of former employees, Comex officials, experts, and attorneys whom it intends to call as witnesses on subjects such as the institution of position limits, the procedures employed by ACLI in New York for investigating and accepting accounts and orders, the amount of damages incurred, the nature of commodities trading and Comex position limits, the settlement negotiations between ACLI and Nahas, and Nahas' financial condition in 1980. Notwithstanding the testimony bearing upon the fraudulent inducement claim against Nahas, however, none of these witnesses possesses first-hand knowledge about the crucial factual issues concerning the main fraud claim against BPS. Moreover, neither the testimony about ACLI procedures, deficit balances, and commodities trading generally nor the financial records in ACLI's custody appears likely to be the subject of significant dispute at trial. Rather, by the nature of the case, much of this testimony will be "fundamentally mechanical," *Fogel*, 48 F.R.D. at 291, and, as Judge Weinfeld found under similar circumstances in *Fustok*, "these matters, if pertinent at all, ... are subordinate to the basic issue central to plaintiff's claims," *Fustok*, 546 F.Supp. at 511. Consequently, because credibility is not likely to be an issue for ACLI's United States witnesses, their presence at trial to give live testimony is not a necessity, or at least not nearly as important as the live testimony of the Swiss witnesses will be to ACLI's claim against BPS.

In addition to the nature of the testimony, it is also significant that all the former ACLI officials and experts are expected to testify voluntarily—a notable contrast to the likelihood of obtaining the live testimony of Hirschi, Bally, Baehler, and St. Severin without court compulsion.

It is true that a trial in New York would be more convenient for ACLI's United States-based witnesses and that most of the documentary evidence in this case is likely to be found in New York. (On the other hand, there is little doubt that BPS' employee witnesses and most of the nominal account holders would find a trial in Geneva more convenient than one in New York.) The reality in this case, however, is that while it may be burdensome to transport some secondary witnesses to Switzerland (and arrange for the translation of their testimony), it appears to be impossible to ensure the live testimony at a trial in New York of the four key witnesses to the principal fraud which is the subject of this action.

The fraudulent inducement claim against Nahas alone presents different considerations. The testimony of ACLI's principals and attorneys, as well as that of Nahas and his representatives, will be necessary to resolve the factual disputes relating to that claim, and live testimony would be highly desirable to permit the factfinder to assess credibility. It appears that, with the exception of Nahas himself, all of the witnesses to the settlement negotiations for both sides now live in the United States, most in New York. Nevertheless, ACLI can be expected to produce its witnesses in Switzerland, if necessary; Nahas' attorneys—Robinson and Getraer—have indicated their willingness to testify in Switzerland if they and their counsel are reimbursed for their expenses and lost professional time, *see*

---

**8.** BPS also argues that there are serious obstacles under Swiss law to the enforcement against the assets of a Swiss domiciliary of a judgment rendered by an American court and thus that litigation of this case in New York might prove fruitless and wasteful of American judicial resources. *See* Verified Statement of Gilles Favre, Esq. at ¶ 12. This consideration, while arguably a public interest factor, would seem to be of genuine concern only to plaintiff ACLI, however, and ACLI has stated that any judgment it expects to obtain in this lawsuit "could be satisfied against the Banque's substantial assets in the United States." Affidavit of William R. Glendon at ¶ 15 (Sept. 12, 1986).

Affidavit of Douglas L. Wald, Esq. at ¶ 3 (Oct. 1, 1986); and Nahas has also stated his willingness to testify at a trial in Switzerland.

### (2)

The parties hotly dispute whether New York or Swiss law applies to the case. As to the issue of fraudulent misrepresentation, it would seem that application of New York's choice of law rules, *see Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985) (applying "interest analysis" approach), does not produce a clear result. Although it is not appropriate to engage here in a complex conflict of laws inquiry, *Piper*, 454 U.S. at 251, 102 S.Ct. at 263, it can be noted that the locus of the tort and domiciles of the parties are usually the most significant determinants, *Schultz*, 65 N.Y.2d at 197, 491 N.Y.S.2d at 95, 480 N.E.2d at 684. The facts of this case present split domiciles—New York and Switzerland—and misrepresentations alleged to have been made in Switzerland, relied upon in both Switzerland and New York, and causing injury in New York.[9]

As to the issues of agency and bank secrecy, however, both clearly rooted in Switzerland and involving exclusively Swiss citizens, there is a much greater likelihood that Swiss law will provide the rule of decision. Thus, the choice of law factor can be said to favor a Swiss forum.[10]

### (3)

ACLI is correct that New York and the United States have an interest in protecting their residents from overseas fraud and ensuring the integrity of the commodities markets. However, Switzerland, for its part, also has an interest in deterring the kind of fraud alleged in this case to have been perpetrated by one Swiss entity, Advicorp or BPS, upon another, ACLI Geneva. Moreover, despite ACLI's characterization of this action as intimately bound up with federal commodities laws and regulations, there are in the case only two common law fraud claims. Ultimately, therefore, the "local interest" factor does not dictate the choice of either forum.

\*    \*    \*    \*    \*    \*

In conclusion, the motion to dismiss is granted. The need to ensure the live testimony of key witnesses to the fraud charged against BPS overcomes the deference accorded to ACLI's choice of its home forum, and the remaining private and public interest factors weigh in favor of adjudicating this action in a Swiss forum.

### V.

Dismissal of this action on *forum non conveniens* grounds is subject to five conditions. First, defendants must consent to suit in Geneva. Second, defendants must waive any statute of limitations defenses they may have under Swiss law. Both conditions "are not unusual and have been imposed in numerous cases where the foreign court [might] not provide an adequate alternative in the absence of such [conditions]." *In re Union Carbide Corpora-*

---

**9.** Even the Restatement (Second) of Conflict of Laws, which contains a special section to guide the selection of law governing fraudulent misrepresentations made in one forum and relied on in another, does not settle the question. *See* Restatement (Second) of Conflict of Laws § 148(2) (1971).

The parties do not address the question of what law applies to the fraudulent inducement claim against Nahas.

**10.** ACLI also argues that because the account agreements between ACLI and BPS and between ACLI and the nominees contain a provision stating that "[t]his agreement ... is governed by the State of New York," and a provision stating that "in the event of any controversy ... arising under or in connection with the terms of this agreement, the customer hereby consents to submit to the jurisdiction of the courts of the State of New York," Affidavit of William R. Glendon, Exhibit A at ¶¶ 12, 16, New York law must apply to the issues in this lawsuit. This argument is rejected for two reasons: first, this case involves a tort action, which would not be covered by a choice of law clause governing disputes over the "construction, validity, performance, and enforcement" of a contract, *id.* at ¶ 12; second, this action does not concern the customer account agreement between ACLI and BPS.

*tion Gas Plant Disaster at Bhopal, India in December, 1984,* 809 F.2d 195, 204 (2d Cir.1987). Third, should the Swiss court not recognize ACLI's cause of action and for that reason decline to adjudicate the case, BPS must consent to ACLI's reinstitution of the lawsuit in the Southern District of New York without prejudice resulting from any statute of limitations bars. Fourth, defendants must consent to the use in the Swiss litigation of all evidence heretofore obtained in this case through discovery in the United States. This condition applies reciprocally to the use by defendants of evidence discovered from ACLI as well. *See id.,* at 205. Fifth, Nahas must agree to testify at a trial of this action in Switzerland.

This ruling shall apply to both defendants who have appeared in this case, BPS and Nahas, unless within 30 days ACLI moves to sever the fraudulent inducement claim against Nahas from this action.[11] Although ACLI has stated that "the action obviously could not be severed, and transferred to Switzerland with respect to defendant BPS alone, without extensive duplication and waste of the resources of the Courts and the parties," Letter of Guy C. Quinlan (Oct. 20, 1986), ACLI may have been referring to both claims against Nahas, not the fraudulent inducement claim alone. It is to be noted in this regard that on the present record it appears that the considerations which support dismissal of this action, as a whole, on *forum non conveniens* grounds, would be largely absent if the fraudulent inducement claim against Nahas were examined as an independent action.

Subject to the conditions described above and ACLI's right to move within 30 days to sever from this action the fraudulent in-

ducement claim against Nahas, the motion to dismiss on *forum non conveniens* grounds is granted.

It is so ordered.

---

11. Judge Sofaer expressed the opinion in an earlier decision in the case that

a separate trial may make sense on the issue of fraudulent inducement. The evidence relating to that issue will differ from the evidence relating to the underlying fraud. The trial of that issue may also result in removing Nahas from the case; in any event, after resolution of the fraudulent inducement claim, the parties will be in a far better position to

evaluate the potential liability of each defendant, making settlement more likely. Moreover, a trial of both issues together might prejudice Nahas, since the jury will be informed that he paid $8 million to settle the very claim in dispute.

*ACLI International Commodity Services, Inc. v. Banque Populaire Suisse,* 609 F.Supp. 434, 450 (S.D.N.Y.1984).